UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JAMES HENRY PARISEAU, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 2:20-cv-01224-JHE |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) |
| Defendant. | ) ) |

# MEMORANDUM OPINION[1]

Plaintiff James Henry Pariseau ("Pariseau") seeks review, pursuant to 42 U.S.C. § 405(g) and § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying his applications for supplemental security income ("SSI"), a period of disability, and disability insurance benefits ("DIB"). (Doc. 1). Pariseau timely pursued and exhausted his administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Factual and Procedural History

On April 8, 2018, Pariseau protectively filed applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") alleging disability beginning on June 15, 2014. (Tr. 152, 154). The Commissioner initially denied Pariseau's claim (tr. 94, 99), and Pariseau requested a hearing before an ALJ (tr. 104-05). Pariseau appeared and

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 15).

testified at a hearing before an Administrative Law Judge ("ALJ") on August 15, 2019. (Tr. 31). The ALJ entered an unfavorable decision dated September 23, 2019, denying Pariseau's claim. (Tr. 12). Pariseau sought review by the Appeals Council, but it denied his request for review on June 26, 2020. (Tr. 1). On that date, the ALJ's decision became the final decision of the Commissioner. On August 21, 2020, Pariseau initiated this action. (Doc. 1).

Pariseau was 43-years-old on his alleged onset date, and 48-years-old at the time of the ALJ's decision. (Tr. 24, 36, 152, 154). He has at least a high school education and past relevant work experience in shipping and receiving. (Tr. 24, 25, 55-56, 195-96). Pariseau alleges he is unable to work because of depression/suicidal ideation, morbid obesity, respiratory problems, arthritis, high blood pressure, swelling in his legs, cellulitis, water retention, and a bulging disc. (Tr. 194).

## II. Standard of Review[2]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

---

[2] In general, the legal standards applied are the same whether a claimant seeks SSI or DIB. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[3] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

---

[3] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v).  The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Pariseau had not engaged in substantial gainful activity since his alleged onset date, June 15, 2014.  (Tr. 17).  At Step Two, the ALJ determined Pariseau had a combination of the following severe impairments: morbid obesity, degenerative disc disease, cellulitis and edema of the lower extremities, polyarthritis, degenerative joint disease of the knees, depression, chronic obstructive pulmonary disease (COPD), asthma, and borderline intellectual functioning. (Tr. 17).  At Step Three, the ALJ found Pariseau does not have an impairment or

4

combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18).

Before proceeding to Step Four, the ALJ determined Pariseau's residual functioning capacity ("RFC"), which is the most a claimant can do despite his impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Pariseau has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a),[4] except he can occasionally use foot controls bilaterally; can occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, or crawl; no exposure to excessive vibration; can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places; and limited to simple and routine tasks, but not at a production rate pace. (Tr. 20-24). At Step Four, the ALJ determined Pariseau was unable to perform any past relevant work. (Tr. 24). At Step Five, relying in part on testimony from a vocational expert ("VE"), the ALJ determined, based on Pariseau's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy Pariseau could perform. (Tr. 25-26). Therefore, the ALJ determined Pariseau has not been under a disability and denied his claim. (Tr. 26).

---

[4] These regulations provide as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

**V. Analysis**

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Williams*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Pariseau challenges the Commissioner's denial of benefits on two distinct grounds. (Doc. 16 at 5). First, Pariseau contends the denial of benefits should be reversed because the ALJ erred when he failed to consider whether Pariseau's chronic edema meets or equals Listing 4.11A. (*Id.*). Pariseau also asserts reversal is warranted because the ALJ's rationale for disregarding Dr. Cleon Roger's opinion is not consistent with the evidence of record. (*Id.*).

**A. Meets or Equals § 4.11A of the Listing of Impairments**

Pariseau contends the Commissioner's decision should be reversed because the ALJ erred when he failed to consider whether Pariseau's chronic edema meets or equals Listing 4.11A. (Doc. 16 at 5).

**1. The ALJ was not required to explicitly discuss whether Pariseau's impairments met or equaled Listing 4.11A.**

At step three of the five-step sequential evaluation process, the ALJ found Pariseau did not have an impairment or combination of impairments that met or equaled an impairment in the Listing of Impairments ("Listings") (Tr. 64-66). *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, app. 1 (2019). While the Listings must be

considered in making a disability determination, the Eleventh Circuit does not require that the Commissioner "mechanically recite the evidence leading to her determination. There may be an implied finding that a claimant does not meet a listing." *Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986).

As an initial matter, Pariseau did not allege his impairments met or medically equaled this Listing in any documents or at the hearing, even though he was represented by an attorney during the administrative process. (Tr. 31-61, 140-41). Because Pariseau did not raise this issue, the ALJ was not required to explicitly discuss the Listing in his decision. *See, e.g., Prince v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 967, (11th Cir. 2014); *Davenport v. Astrue*, 403 F. App'x 352, 354 (11th Cir. 2010); *Johnson v. Barnhart*, 148 F. App'x 838, 842 (11th Cir. 2005).

### 2. Pariseau has not demonstrated that his impairments met or equaled Listing 4.11A.

As to the merits of this claim, Pariseau has not demonstrated that his impairments met or equaled Listing 4.11A. "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002); *see* 20 C.F.R. § 404.1525; *see also* 20 C.F.R. §§ 404.1509, 416.909 (stating duration requirement means that impairment "must have lasted or must be expected to last for a continuous period of at least 12 months"). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

"To 'equal' a Listing, the medical findings must be at least equal in severity and duration to the listed findings." *Wilson*, 284 F.3d at 1224; 20 C.F.R. § 404.1526. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar impairment." *Zebley*, 493 U.S. at 531. "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* The claimant bears the burden of proving that his impairments met or equaled a Listing. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

> Social Security Listing 4.11 states, in relevant part, as follows:
>
> 4.11 Chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following: A. Extensive brawny edema (see 4.00G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip.

Appendix I, Listing 4.11. Listing 4.00G3 further defines brawny edema as, "swelling that is usually dense and feels firm due to the presence of increased connective tissue. . . ." Appendix I, Listing 4.00G3. The Listing further describes brawny edema as, "it is also associated with characteristic skin pigmentation changes. It is not the same thing as pitting edema. Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable." *Id.*

Although the ALJ considered Listings 12.04 (depressive, bipolar and related disorders) and 12.11 (neurodevelopmental disorders), despite finding Pariseau suffered from the severe impairment of "cellulitis and edema of the lower extremities" and reviewing record evidence of bilateral lower extremity edema, the ALJ did not consider or mention Listing 4.11A, which addresses chronic venous insufficiency -specifically extensive brawny edema. (*See* tr. 18).

There is evidence related to lower extremity edema from St. Vincent's East and Dr. Cleon Rogers. On March 1, 2017, Pariseau presented to St. Vincent's East with complaints of lower extremity swelling and pain. (Tr. 263-66). Pariseau reported ongoing issues with lower extremity swelling despite previous medications. (*Id.*). Pariseau was admitted and received inpatient care from March 1 through March 4, during which time he received treatment, including IV antibiotics and blood pressure medication. (*Id.*). Symptoms improved over the next 48 hours, including a decrease in swelling and significant improvement in redness and warmth of the left foot and ankle. (*Id.*). Pariseau was prescribed an oral antibiotic and discharged. (*Id.*). Upon discharge, Pariseau's diagnoses included left lower extremity cellulitis, chronic lymphedema, chronic shortness of breath secondary to obesity, morbid obesity, hypertension, and degenerative joint disease. (*Id*).

On April 3, 2017, Pariseau presented to his treating physician Dr. Rogers at Christ Health Center for follow up and refills after a recent hospitalization. (Tr. 348-51). Examination revealed mild dyspnea at rest, limited ambulation, bilateral 3 plus edema, left greater than right with erythema on top of foot and coin shaped sores, and an irregular gait. (*Id*). Dr. Rogers applied an Unna boot to Pariseau's left leg to control edema and any resultant skin issues (tr. 350-351). On April 26, 2017, Pariseau presented for a follow up and reported that his pain was "a lot better." (Tr. 347-48). Examination revealed that his lower extremity edema was better, and his skin was not as red. (*Id.*).

On July 28, 2017, Pariseau presented to Dr. Rogers with chief complaints of fatigue, pain in knees, and sweating/feeling hot. (Tr. 341-343). Examination revealed 2 plus edema bilaterally (Tr. 343).

On August 28, 2017, Pariseau presented to Dr. Rogers for a follow-up and medication refills. (Tr. 338-340). Pariseau reported lower leg edema that improved with Lasix. (Tr. 340). Examination revealed 1 plus edema bilaterally (*Id.*). Examination revealed 1 plus edema bilaterally. (*Id.*).

On November 15, 2017, Pariseau presented to Dr. Rogers for a follow up and medication refills. (Tr. 336-38). Examination revealed trace bilateral edema in his extremities. (Tr. 338).

Almost a year later, on September 7, 2018, Pariseau presented to Dr. Rogers with complaints of bilateral leg pain. (Tr. 471-73). Physical examination revealed 1 plus edema in the lower extremities (Tr. 473). Based on complaints of severe knee pain, Dr. Rogers proceeded with a kenelog injection into Pariseau's left knee. (*Id.*). Notes indicate no effusion, erythema, or warmth and that the skin was clear. (*Id.*).

On December 13, 2018, Pariseau presented to Dr. Rogers for medication refills and complaints of chest congestion. (Tr. 466-68). Examination revealed lower extremity edema, worse on the right, 2 plus to the midshin. (Tr. 468).

On April 11, 2019, Pariseasu presented to Dr. Rogers with complaints of swelling in his left leg. (Tr. 459-62). Pariseasu reported that his left leg had increased swelling for the past two weeks. (Tr. 461). Examination revealed bilateral edema, and Dr. Rogers noted "Left leg is very edematous, up into thigh. Skin is tight and nonpitting, dry/thickened, red, and very tender especially on medial thigh. There are numerous papules and pustules on the medial thigh." (Tr. 461-462). Dr. Rogers assessed peripheral venous insufficiency, depressive disorder, essential hypertension, morbid obesity and cellulitis of lower limb, and he prescribed metformin, flouxetine, lisinopril, furosemide, and Bactrim DS. (Tr. 462).

On April 18, 2019, Pariseau presented to Dr. Rogers for his one-week follow-up regarding his legs. (Tr. 457-59). Examination revealed "Both lower extremities w/ nonpitting edema, L>R; Left lower extremity with nonpitting edema up into thigh, thick, dry, dark skin half way up shins, bruise on anterior side from car accident; small ulcers and scabs; no weeping; papules/pustules on medial thigh; very tender." (Tr. 459). Dr. Rogers assessed edema and noted that the "cellulitis [was] resolving." (*Id.*). He instructed Pariseau to continue taking Lasix and again prescribed Bactrim DS (*Id.*). Dr. Rogers scheduled Pariseau for a two month follow-up. (*Id.*).

These records provide substantial evidence for the ALJ's implicit finding that Pariseau has not demonstrated that his impairments meet or equal Listing 4.11A. Specifically, these records demonstrate that, although Pariseau has exhibited nonpitting edema on occasion, he has not demonstrated that his condition is of the severity or duration required to meet or equal Listing 4.11A. The records from 2017 show Pariseau's edema improved with medication and continually improved over the course of the year. (Tr. 263-66, 336-43, 347-51). At Pariseau's November 15, 2017 follow-up appointment, Dr. Rogers noted only bilateral trace edema in extremities. (Tr. 336-38). There are no relevant records until almost a year later, when Pariseau presented to Dr. Rogers on September 7, 2018, with bilateral leg pain. (Tr. 471-73). Although examination revealed bilateral lower extremity one plus edema, Dr. Rogers noted no effusion, erythema, or warmth and that his skin was clear. (*Id.*). Additionally, although nonpitting edema is noted in two records from April 2019, this appears to be an isolated flare up. During the second April 2019 visit Dr. Rogers observed that the "cellulitis [was] resolving" and that Pariseau should continue with the Lasix, which Pariseau had previous stated improved his edema, and prescribed Bactrim DS. (Tr. 457-59). Dr. Rogers did not schedule Pariseau for a return visit until two months later. (*Id.*). Thus, while there is evidence of bilateral lower extremity edema, Pariseau has not shown that his

11

condition is of the severity or duration required to meet or equal the Listing. The ALJ did not err when he implicitly found Pariseau does not meet or equal Listing 4.11A.

### B. Finding Dr. Cleon Rogers's Medical Opinion Not Persuasive

On May 30, 2019, Dr. Cleon Rogers completed a Clinical Assessment of Pain (tr. 482), a Physical Capacities Evaluation (tr. 483), and a mental assessment (tr. 484-486). The ALJ stated he found the opinion of Dr. Cleon Rogers to be "not persuasive because it is not consistent with or supported by his internally inconsistent explanations and limitations, lack of support with the medical evidence of record and examination findings therein, examination findings from treatment records, and lack of support from the doctor's qualifications in providing limitations in regards to [Pariseau's] mental health, as well as the opinion consisting of a series of checked boxes on a f[o]rm with explanation lines generally left blank o[r] devoid of additional information." (Tr. 24) (citing tr. 482-86).

#### 1. Blank Lines and Comments

As an initial matter, Pariseau points to the last part of this explanation – "with explanation lines generally left blank o[r] devoid of additional information" and contends this is factually incorrect, calling into question the rationale behind the ALJ's dismissal of Dr. Rogers' opinion. (Doc. 16 at 17). The cited records include three forms Dr. Rogers completed: a Clinical Assessment of Pain (tr. 482), Physical Capacities Evaluation (tr. 483), and a mental assessment (tr. 484-86). Of these forms only two, the Physical Capacities Evaluation and the mental assessment, contain explanation and/or comment lines. (Tr. 483, 484-86). In both instances, Dr. Rogers offered an explanation or comment. On the Physical Capacities Evaluation, Dr. Rogers explained "Pt [patient] has asthma and frequent exacerbations. He has severe OA [osteoarthritis] and low back pain that impairs work[.]" (Tr. 483). In the comments portion of the mental

12

assessment Dr. Rogers stated "Pt [patient] has depression, fairly well controlled although he occasionally does have severe spells" (Tr. 486).

At least to some extent, the factual inaccuracy of this analysis certainly calls into question the rationale behind the ALJ's dismissal of Dr. Roger's opinion. However, notwithstanding this inaccurate description, there is substantial evidence to support the ALJ's finding that Dr. Rogers' opinion is not persuasive.

### 2. Standard of Review

For claims filed on or after March 27, 2017, such as Pariseau's claim, the SSA's new regulations apply. *See* 20 C.F.R. § 404.1520c. This new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion. Under the new regulations, an ALJ should focus on the persuasiveness of medical opinions and prior administrative medical findings by looking at five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* § 404.1520c(c)(1)–(5); *see Matos v. Comm'r of Soc. Sec.*, No. 21-11764, 2022 WL 97144, *4 (11th Cir. Jan. 10, 2022); *see also Harner v. SSA, Commr.*, No. 21-12148 (11th Cir. June 27, 2022) (holding the new regulations validly abrogated the treating physician rule).

The ALJ may, but is not required to, explain how he considered factors other than supportability and consistency, which are the most important factors. 20 C.F.R. § 404.1520c(b) "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). And "[t]he more consistent a medical opinion(s) or prior

administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Pariseau contends that, under these new regulations, Dr. Rogers' opinion should be found to be persuasive and that, without adequately articulated grounds for rejecting the opinion, the court cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence. (Doc. 16 at 18-20). The record does not support Pariseau's position.

### 3. Application – Supportability and Consistency

The ALJ expressly found Dr. Rogers' opinion not persuasive after considering the two most important factors: supportability and consistency. (Tr. 24). Specifically, the ALJ concluded that Dr. Rogers' opinion was not persuasive because it was not consistent with and was not supported by his own internally inconsistent explanations and limitations as well as lacking support in the other medical evidence and examination findings. (Tr. 24). Notably, the question here is not whether there is support in the record for any of Dr. Rogers' opinions, but rather whether there is substantial evidence to support the ALJ's determination that Dr. Rogers' opinion was not persuasive.

Although Pariseau alleges the ALJ did not discuss Dr. Rogers' treatment records, the ALJ did consider Dr. Rogers' records as well as other medical records elsewhere in the decision.[5] As

---

[5] "[I]t is proper to read the ALJ's decision a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses" at multiple points in the decision. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004); *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (holding ALJ's decision, read as a whole, contained sufficient explanation for step three finding because ALJ is not required to "use particular language or adhere to a particular format"); *Bradford v. Sec'y of Dep't of Health & Human Servs*., 803 F.2d 871, 873 (6th Cir. 1986) (explaining ALJ's decision should be considered as "entire opinion").

14

to Pariseau's physical limitations, the ALJ found that Pariseau had no on-going aggressive treatment or significant abnormal findings; that he was able to perform a wide range of activities of daily living; and that he had not been referred to a specialist or for any on-going aggressive treatment. (Tr. 20). In reviewing the medical record, the ALJ noted that a December 2014 physical examination revealed Pariseau was able to get on and off the exam table, able to ambulate without an assistance device, had normal chest and lung findings, and had a normal gait despite being uncomfortable. (Tr. 22) (citing tr. 250-56). The ALJ also recognized records indicating Pariseau could squat three-fourths of the way down despite knee pain. (*Id.*). The ALJ explained that the lumbosacral x-ray from this time showed degenerative changes with likely foraminal stenosis at the L5-S1 level. (*Id.*).

The ALJ also noted Pariseau intermittently went to the emergency room for knee pain or other non-severe issues, but typically had normal respiratory findings at these times, had normal ambulatory status, intact ranges of motion for all extremities, and no muscle weakness, was treated for his pain, and discharged in stable condition. (Tr. 21) (citing tr. 257-325 & tr. 369-453). The ALJ acknowledged that a tibia and fibula view from February 2016 showed no fracture and only some moderate degenerative osteoarthrosis in the knee joint. (*Id.*). During a March 2017 emergency room visit for cellulitis and lower extremity swelling and pain, Pariseau was treated, had improved symptoms, and was discharged in stable condition a few days later. (*Id.*). The ALJ also noted Pariseau's March 2017 chest x-ray showed normal findings, including that his lungs were clear and pulmonary vessels were normal. (Tr. 21) (citing tr. 257-325).

As to Dr. Rogers' records, the ALJ further acknowledged that Pariseau received general treatment from Christ Health Center and received refills on medications. (Tr. 21) (citing tr. 326-54 and tr. 454-80). The ALJ recognized that these records from Dr. Rogers show Pariseau had

15

"intermittent breathing issues" that he attributed to an exterminator spray, and that upon examination, Pariseau generally had normal findings, such as normal breath sounds and good air movement. (Tr. 21). The ALJ also noted the "intermittent edema findings" in Pariseau's lower extremities, but noted he had largely normal findings, including normal gait and motor strength. (*Id.*).

The ALJ properly evaluated the persuasiveness of Dr. Rogers' opinions under the applicable regulations. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). As articulated in the paragraphs above, there is substantial evidence that Dr. Rogers' opinion were not persuasive because they were unsupported by and inconsistent with the record as a whole.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Pariseau's claim for supplemental security income, a period of disability, and disability insurance benefits is **AFFIRMED**.

DONE this 15th day of September, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE